United States District Court
Southern District of Texas
FILED

FEB 2 3 2001

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SYLVIA VASQUEZ | § | |
| PLAINTIFF | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-108 |
| | § | (JURY REQUESTED) |
| K-MART CORPORATION, | § | |
| RANSOM OLDS, and | § | |
| DOLLY BARRERA | § | |
| DEFENDANTS | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COME NOW, Defendants, **K-MART CORPORATION, RANSOM OLDS and**

**DOLLY BARRERA,** and file this their Motion for Summary Judgment pursuant to Rule 56

F.R.C.P. and in support thereof would show this Honorable Court as follows:

### INTRODUCTION

Plaintiff filed her Original Complaint alleging a violation of the ADA, the Texas Labor

Code, and intentional infliction of emotional distress. Plaintiff was employed as the Loss

Control Manager at the Brownsville K-Mart. She has alleged that the store manager, Ransom

Olds, and Operations Manager, Dolly Barrera, made comments about her hearing and her use of

a hearing aid which constituted a hostile environment and led to her constructive termination.

Defendants are entitled to summary judgment for the following:

    1)    Plaintiff did not suffer tangible employment action;

    2)    Plaintiff's allegations do not rise to the level necessary to constitute a hostile

-1-

environment;

3)    Defendant is entitled to the *Ellerth/Faragher* affirmative defenses;

4)    Plaintiff is not disabled under *Sutton v. United Airlines,* 119 S.Ct. 2139 (1999).

5)    Defendants' conduct does not rise to the level necessary for intentional infliction of emotional distress;

6)    Plaintiff did not suffer severe emotional distress.

## FACTUAL BACKGROUND

The Plaintiff bases her complaint on allegations that Ransom Olds, the K-Mart store manager, and Dolly Barrera, the Operations Manager made comments about her hearing that constituted a hostile environment. In her responses to interrogatories and in her deposition, Plaintiff describes the comments made. (See Plaintiff's Responses to Interrogatories and Plaintiff's deposition taken on February 7, 2001 attached hereto as Exhibits "A" and "B" respectively.)

Plaintiff states that Mr. Olds, the store manager began making "funny" comments about her use of a hearing aid sometime in 1998. Plaintiff indicated that she had a good working relationship with Mr. Olds, and believes that what he said was in jest. (See pg 29, ln 20-25; pg 30, ln 1-5; pg 72, ln 25; pg 73, ln 1, of Exhibit "B".) She never told him that they offended her. (See pg. 31, ln 16-18, of Exhibit "B".) She claims she would try to give him looks, attempting to let him know she did not appreciate his comments, but it was not until November, 1999, that she gave him an exceptionally angry look that he understood. (See pg. 32, ln 9-24; pg 33, ln 1-5 of Exhibit "B".) On that occasion, he immediately said he was sorry about his comment. The comments Mr. Olds allegedly made were "can you hear me?" and "turn up that volume, girl." (See Response No. 12 of Exhibit "A".)

-2-

The Plaintiff claims that Ms. Barrera, who she did not have a good working relationship with, made two separate comments to her and one to a co-employee. Ms. Barrera made a comment in October 1999 in the presence of other personnel that the Plaintiff only heard what she wanted to hear. (See pg 37, ln 1-16 of Exhibit "B".) This was said when the Plaintiff went back to the doorway of the room where Ms. Barrera was and asked her what she had just said. The second comment was made at the service desk when Ms. Barrera claimed the Plaintiff could not hear her paging her. On this occasion, the Plaintiff claims that she was called to the service desk because there was an unruly customer yelling at Ms. Barrera. When Ms. Barrera claimed the Plaintiff could not hear the pages, she asked the service desk clerk how many times she had been paged, and the clerk held up one finger, indicating that she had paged Plaintiff only once. (See pg 34, ln 12-25; pg 35, ln 1-9 of Exhibit "B".) The Plaintiff cannot recall any other comments by Ms. Barrera. (See pg 39, ln 1-5 of Exhibit "B".)

That same day, November 7, 1999, the Plaintiff met San Juanita Garza in the back offices. Ms. Garza told the Plaintiff that Ms. Barrera had just told her that the Plaintiff would not hear someone knocking on her door because she would turn her hearing aid all the way down. (See pg 35, ln 13-25; pg 36, ln 1-8 of Exhibit "B".) The Plaintiff claims she was so upset she went home. (See pg 36, ln 9-10 of Exhibit "B".) The next day, a Monday, she spoke to Mr. Olds about Ms. Barrera. Mr. Olds then called the District Manager, Mr. Glover and told him that the Plaintiff was having problems with Ms. Barrera. (See pg 24, ln 1-12; pg 36, ln 13-19 of Exhibit "B".) Mr. Olds allegedly informed her that he would see her the next day, since he was coming to the store. On November 9, 1999, Mr. Glover went to the store, but did not talk to the Plaintiff about her complaint. (See pg 24, ln 13-25; pg 25, ln 19-21 of Exhibit "B".) The Plaintiff did not approach Mr. Glover about her complaint either, despite the fact that she did talk to him about a

-3-

project she was working on. (See pg 25, ln 19-21 of Exhibit "B".)  She claims she expected Mr.

Glover to come to her to talk about the situation.  On the following day, the Plaintiff claims she

called the action hotline that K-Mart has available to its employees to register complaints about

their employment. (See pg 26, ln 2-5 of Exhibit "B".)  They told her that the person who needed

to handle that situation was Mr. Glover. (See pg 26, ln 14-16 of Exhibit "B".)  She claims she

also called the Human Resource District Manager (hereinafter "HRDM"), a woman named

Rachel, and left a message for her to call back. (See pg 27, ln 10-18 of Exhibit "B".)  She had

not received a call back by the end of that day, Wednesday, November 10, 1999, so she

abandoned her employment. (See pg 27, ln 19-23 of Exhibit "B".)  She did not return to work

after that day.  She does not know if the HRDM ever called her back, and does not know if Mr.

Glover ever discussed the problem with Ms. Barrera or took any other action. (See pg 56, ln 8-

15; pg 57, ln 9-11 of Exhibit "B".)

## LEGAL ARGUMENT

The Fifth Circuit does not yet specifically recognize or reject a hostile environment

harassment claim based on disability.  Texas courts have not yet addressed that issue under a

state law claim.  In *McConathy v. Dr. Pepper/Seven Up Corporation*, 131 F.3d 558, 563 (5th Cir.

1998), the Court stated that this case could not be cited to support or reject recognition of such a

claim.  However, the Court said if such a claim were so recognized, it would have the same

elements as other hostile environment harassment claims.  The Plaintiff would have the burden

of proving: 1) that she belonged to a protected group; 2) that she was subject to unwelcome

harassment; 3) that the harassment was based on her **disability**; 4) that it affected a term,

condition or privilege of employment; and 5) that the employer knew or should have known of

the harassment and failed to take prompt, remedial action.  The Court, citing *Farpella-Crosby v.*

-4-

*Horizon Health Care,* 97 F3d 803, 806 (5th Cir. 1996), stated that, like sexual harassment, the conduct would have to be sufficiently pervasive and severe to alter the conditions of employment and create an abusive working environment. The Court also stated that the same reasoning applied in *DeAngelis v. El Paso Municipal Police Officers Ass'n,* 51 F.3d 591, 595-596 (5th Cir. 1995) should be applied in analyzing this type of claim in that a mere utterance of an "epithet which engenders offensive feelings in an employee" is not enough to constitute hostile environment harassment.

*McConathy* was decided before the United States Supreme Court decided *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In these two cases, the Supreme court fashioned a clear analytical process which should guide the lower courts in scrutinizing sexual harassment cases. Since the Fifth Circuit enunciated in *McConathy* the same elements as had previously been applied to sexual harassment cases, it is logical to assume that the Fifth Circuit, should it ever decide to recognize a hostile environment harassment claim based on disability, would most likely apply the same factors as those announced in the *Ellerth/Faragher* cases.

In *Casiano v. A.T.& T. Corp.,* 213 F.3d 278 (5th Cir. 2000) the Fifth Circuit devised what they called a road map for analyzing sexual harassment claims. It was based on the *Ellerth/Faragher* framework and would most likely be that applied to this kind of claim. Thus, Defendants will present their position following the Fifth Circuit's *Casiano* road map.

**There was no tangible employment action.** Plaintiff did not suffer any tangible employment action. No term, condition, or privilege of her employment was affected. No adverse employment action was taken against her. (See Response to Interrogatory No. 10 of

Exhibit "A" and pg 53 - 56, ln 1-23 of Exhibit "B".) Under the *Casiano* road map analysis, once

a determination that no tangible employment action was taken, the Court must then inquire as to

whether the acts complained of constitute severe or pervasive harassment.

**Conduct not "severe and pervasive".** In this case, Plaintiff complains that Mr. Olds

would make "funny comments" intended as workplace banter, jokes, certainly not intended to

offend her. She also complains of two comments made by Ms. Barrera. These statements, even

if true, do not rise to the level required by law to constitute a hostile environment. They are not

"sufficiently pervasive and severe" to have altered the conditions of her employment and they

did not create an "abusive" working environment. In describing what constituted a "hostile

environment" the Supreme Court has stated that "Title VII is violated when the work place is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to create a discriminatory hostile or abusive working environment." *Meritor Savings

Bank, FSB. v. Vinson,* 477 U.S. 57, 64, 67, 106 S.Ct. 2399, 2405-406, 91 L.Ed.2d 49 (1986); *see

also Garcia v. Schwab,* 967 S.W.2d 883,885 (Tex. App.–Corpus Christi 1998, no writ). If the

conduct is not severe or pervasive enough to create a work environment that a reasonable person

would find hostile or abusive then Title VII is not triggered. *Harris v. Forklift Sys. Inc.,* 510 U.S.

17, 22, 114 S.C. 367, 370, 126 L.Ed.2d 295 (1993); *Schwab,* 967 S.W.2d at 885.

The Fifth Circuit said in *DeAngelis* that "to find merit in a hostile environment claim, we

must conclude the conduct complained of expresses extreme insensitivity against [the disabled or

the hearing impaired] and is so egregious in nature as to alter the conditions of employment and

destroy [a disabled person]'s equal opportunity in the work place. A less onerous standard,

couched in terms of conduct that sporadically wounds or offends but does not hinder a [disabled

person's] performance would not serve the goal of equality and, further, would insulate [disabled

-6-

persons], mandating not equality but preference." *DeAngelis* 51 F.3d at 593.  Title VII is not a general civility code for the workplace. *Oncale v. Sundowner Offshore Services Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed. 2d 201, 207 (1998).

Like the facts considered by the Fifth Circuit in *McConathy,* the conduct alleged by the Plaintiff in this case is not the kind of conduct that constitutes a hostile environment for harassment based on a disability.  Thus, Defendants are entitled to summary judgment.

**Defendants entitled to affirmative defenses.**  Under the *Casiano* analysis, if the Court finds that the acts constitute severe and pervasive harassment, the Court must then determine if the Defendant employer is entitled to the affirmative defenses announced in *Ellerth/Faragher*. Specifically, did the employer take reasonable care to prevent or promptly correct any harassing behavior, and did the employee unreasonably fail to take advantage of any preventive measures or avoid harm otherwise.  The facts as alleged by Plaintiff and stated in her deposition are undisputed for purposes of this motion.

The employer, K-Mart has in place an action hotline which employees can call and report any instances of harassing or otherwise offensive behavior.  It is undisputed that Plaintiff never told either Mr. Olds or Ms. Barrera that she found their comments offensive and hurtful.  The employer had a mechanism in place, known to the Plaintiff of how to report these types of problems.  The Plaintiff, however, did not take advantage of it, until immediately before she abandoned her job.

The Plaintiff claims she complained to Mr. Olds on Monday, November 8, 1999.  Mr. Olds reported to Mr. Glover who visited the store on Tuesday, November 9, 1999.  Even though the Plaintiff saw and spoke to Mr. Glover on Tuesday, she did not report, mention or discuss her complaints about Ms. Barrera (and for that matter Mr. Olds) with Mr. Glover.  It is incumbent on

-7-

CutePDF - www.texisi.com

the Plaintiff to report her complaints.  It is not Mr. Glover's burden to approach the Plaintiff.

Even though she spoke to him regarding other matters on that Tuesday, the Plaintiff made no

attempt to talk to Mr. Glover about her problem with Ms. Barrera.  There is no evidence that she

was intending to discuss Mr. Olds' comments with Mr. Glover.

The next day, Wednesday, after Mr. Glover did not approach the Plaintiff, she called the

action hotline and the HRDM.  The Plaintiff did not wait for a response.  She states that the

person she spoke to on the hotline indicated that the person she needed to contact was Mr.

Glover.  The HRDM was not in, so she left a message for the HRDM to call her back.  When the

HRDM did not call back that same day, the Plaintiff abandoned her job.  It is completely

unreasonable to believe that because the HRDM did not return her call that very day, the Plaintiff

was justified in quitting her job.  She never gave K-Mart an opportunity to address, let alone

correct the problem.  The Plaintiff unreasonably failed to take advantage of the preventive and

corrective measures that would have been available to her had she given them a chance to

address the problem.  The employer had measures in place that would have promptly corrected

the problem and Plaintiff unreasonably failed to take advantage of them.  Therefore, Defendants

are entitled to summary judgment based on the *Ellerth/Faragher* affirmative defenses.

**Plaintiff is not "disabled".**  Not only is summary judgment appropriate under the

*Casiano* road map analysis, it is appropriate under the ADA itself.[1]  The Plaintiff has alleged a

violation of the ADA and the Texas Labor Code.  She claims that she is disabled and that

---

[1]Plaintiff has brought suit under Texas Labor Code § 21.002(6).  Texas courts look to federal law and regulations in their interpretation and application of the State statutes which are analogous to the ADA.  Texas has followed and applied the U.S. Supreme Court's definition and analysis of "disability" as set forth in *Sutton v. United Airlines, Inc.*, 119 S.Ct. 2139, 2147, 527 U.S. 471, 144 L.Ed.2d 450 (1999). See *Kiser v. Original, Inc*, 2000 WL 1715895 (Tex.App.-Hous.[14th  Dist.] 2000); *Garcia v. Allen*, 28 S.W.3d 587 (Tex.App.-Corpus Christi 2000); *Morrison v. Pinkerton Inc.*, 7 S.W.3d 851(Tex.App.-Hous. [1st Dist.] 1999)    .

because of her disability she has suffered employment discrimination. In order to have the protection of these statutes, the Plaintiff must qualify as the kind of person they are intended to protect. The Plaintiff is not entitled to the protection of these statutes. The U.S. Supreme Court has held that any determination of a disability must be made with regard to its **corrected** condition. *Sutton v. United Airlines, Inc.*, 119 S.Ct. 2139, 2147, 527 U.S. 471, 144 L.Ed.2d 450 (1999). To be disabled under the statute, an individual must be substantially limited in a major life activity. If, when corrected, the impairment no longer substantially limits the individual in that major life activity, they are no longer "disabled" for purposes of the ADA. *Id* at 2148, 2149.

There is no issue that the Plaintiff is hearing-impaired. However, she uses hearing aids which correct her impairment and does not limit her in any major, or for that matter, minor, life activity. (See pg 70, ln 2-25, pg 71, ln 1-10 of Exhibit "B".) With her hearing aids, Plaintiff can hear like a normal person and is not limited at all. Thus, she is not "disabled" under the ADA and Defendants are entitled to summary judgment under both the federal and state claim.

**Defendants' conduct is not actionable for intentional infliction of emotional distress.**
The Plaintiff has included the cause of action for intentional infliction of emotional distress in her complaint. This is a state tort claim. In order to prevail, the Plaintiff must prove that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct must have been extreme and outrageous--so outrageous as to go beyond all possible bounds of decency; (3) the actions of the defendant must have caused the plaintiff to suffer emotional distress; and (4) the distress must be severe. *Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 613 (5th Cir.1999); *Walker v. Thompson,* 214 F.3d 615, 628 (5th Cir. 2000); *Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir.1991); *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 306 (5th Cir.1989); *Morgan v. Anthony*, 27 S.W.3d 928, 929 (Tex. 2000); *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d

-9-

640, 644 (Tex.1995); *Twyman v. Twyman,* 855 S.W.2d 619, 621-22 (Tex.1993).  Mere violation

of laws regulating conduct in the workplace is not enough to establish intentional infliction.  See

*Wilson,* 939 F.2d at 1143-44; *Sebesta v. Kent Electronics Corp.,* 886 S.W.2d 459, 463-64

(Tex.App.--Houston [1st Dist.] 1994, writ denied); see also *Johnson v. Merrell Dow

Pharmaceuticals, Inc.,* 965 F.2d 31, 33 (5th Cir.1992) ("[A] claim for intentional infliction of

emotional distress will not lie for mere 'employment disputes.'").    In the employer-employee

context, Texas courts have found few incidents to constitute extreme and outrageous conduct.

*Horton v. Montgomery Ward & Co.,* 827 S.W.2d 361, 369 (Tex.App.--San Antonio 1992, writ

denied).  Insults, indignities, threats, annoyances, or petty oppressions, without more, do not rise

to the level of intentional infliction of emotional distress. *Id.* (citing RESTATEMENT (SECOND) OF

TORTS § 46 cmt. d (1965)).  Conduct that is illegal in the context of employment does not

necessarily constitute extreme and outrageous conduct. *Ugalde v. W.A. McKenzie Asphalt Co.,*

990 F.2d 239, 243 (5th Cir.1993).

Extreme and outrageous conduct is conduct " 'so outrageous in character, and so extreme

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community.' " *Twyman,* 855 S.W.2d at 621 (quoting

RESTATEMENT (SECOND) OF TORTS section 46 cmt. d (1965)).  [T]he level of atrociousness to

which [the behavior] must [rise] is quite high.  Simply put, it must exceed all possible bounds of

decency and be utterly intolerable in a civilized society." *Franklin v. Enserch, Inc.,* 961 S.W.2d

704, 710 (Tex.App.--Amarillo 1998, n.w.h.).

"Can't you hear", "turn that thing up, girl", and "you hear only what you want to hear"

are not conduct "so outrageous in character" or "so extreme in degree" as to rise to the level

necessary to constitute intentional infliction of emotional distress.  Plaintiff herself believes that

-10-

Mr. Olds' comments were not made with the intention of hurting her, thus, his comments, by her own admission, cannot constitute the conduct necessary to prevail on this kind of tort. Additionally, the two comments made by Ms. Barrera, though mean and insensitive according to the Plaintiff, are not so extreme or outrageous as to constitute the conduct necessary to prevail under the elements of this tort. Thus, Defendants are entitled to summary judgment on the issue of intentional infliction of emotional distress.

It should be unnecessary to argue the lack of "severe" emotional distress. However, the Plaintiff's only claim is that she suffered "more" depression. This, too, does not rise to the level necessary to be able to prevail under this cause of action. Summary judgment is appropriate.

WHEREFORE, PREMISES CONSIDERED, Defendants move this Court to grant their Motion for Summary Judgment on all counts and dismiss these Defendants from this suit in its entirely, taxing all costs against Plaintiffs, and for all other further relief to which they are justly entitled.

Signed February 23rd, 2001.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By:_____

Eileen M. Leeds
State Bar No. 00791093
USDC Adm. No. 16799

-11-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing, **Defendants' Motion for Summary Judgment**, has been served on all counsel of record as follows:

Mr. Michael R. Cowen
MICHAEL R. COWEN, P.C.
765 East 7th Street, Suite A
Brownsville, Texas 78520

_Eileen Leeds_
Eileen M. Leeds

-12-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SYLVIA VASQUEZ           §
     PLAINTIFF          §
          §
VS.           §    CIVIL ACTION NO. B-00-108
          §    (JURY REQUESTED)
K-MART CORPORATION,           §
RANSOM OLDS, and           §
DOLLY BARRERA           §
     DEFENDANTS          §

---

## AFFIDAVIT

---

THE STATE OF TEXAS           §
          §
COUNTY OF CAMERON           §

     BEFORE ME, the undersigned authority, a notary public, on this day personally appeared EILEEN M. LEEDS, who being by me duly sworn deposed and said under oath:

     My name is EILEEN M. LEEDS. I am over the age of eighteen (18) years, and of sound mind and suffer from no legal disabilities. I have never been convicted of a felony. I am fully competent, duly qualified and authorized to make this Affidavit, and I have personal knowledge of the matters stated herein and they are true and correct.

     The attached excerpts from the deposition of Sylvia Vasquez as Exhibit "B" are true and correct copies of the relevant excerpts of the certified deposition given by this witness in Civil Action No. B-00-108, in the United States District Court for the Southern District of Texas, Brownsville Division.

     Further Affiant sayeth not.

_____
Eileen M. Leeds

     SUBSCRIBED AND SWORN TO before me by the said, EILEEN M. LEEDS, on this the 23rd day of February, 2001, to certify which witness my hand and official seal.

LUZ MARIA GASPAR
Notary Public, State of Texas
My Commission Expires
05/23/2002

_____
Notary Public - State of Texas

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SYLVIA VASQUEZ | § | CIVIL ACTION NO. B-00-108 |
| V. | § | |
| K-MART CORPORATION, ET AL. | § | JURY DEMANDED |

**PLAINTIFF SYLVIA VASOUEZ ' ANSWERS , OBJECTIONS AND RESPONSES
TO DEFENDANT K-MART CORPORATION, RANSOM OLDS AND
DOLLY BARRERA'S INTERROGATORIES AND REQUEST FOR PRODUCTION**

TO:  Defendants, **K-MART CORPORATION, RANSOM OLDS** and **DOLLY BARRERA**, by and through their attorneys of record:

Ms. Eileen M. Leeds
Mr. Lawrence J. Rabb
WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Tx. 78521

COMES NOW, **SYLVIA VASQUEZ,** Plaintiff in the above styled and numbered

cause, by and through her Attorney of Record, and files these her objections, answers

and responses to Defendant K-Mart Corporation, Ransom Olds and Dolly Barrera's

Interrogatories and Request for Production, as follows:

Respectfully submitted,

MICHAEL R. COWEN , P.C.
765 E. 7th Street, Suite A
Brownsville, Texas 78520
(956) 541-4981
(956) 504-3674 (FAX)

Michael R Cowen
State Bar No. 00795306
Federal ID No. 19967
ATTORNEY FOR PLAINTIFF



EXHIBIT A

## CERTIFICATE OF SERVICE

On this the 13th day of December 2000, a true and correct copy of the above and foregoing Plaintiff Sylvia Vasquez' Objections, Answers and Responses to Defendant K-Mart Corporation, Ransom Olds and Dolly Barrera's Interrogatories and Request for Production was sent to opposing counsel in the manner indicated below:

<u>CMRRR#Z-556-619-581</u>
Ms. Eileen M. Leeds
Mr. Lawrence J. Rabb
WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Tx. 78521

Michael R. Cowen

**INTERROGATORY NO.1:**

Identify yourself by stating your full name including all other names by which you are or haie been known, if applicable; date and place of birth; security numbers ever held by you; all drivers license, types numbers and by whom issued, held by you at any time; your address or addresses for the last five years, giving the street, street address, city and state; name of last known street, city and state address of each person to whom you have ever been married, either ceremonially, or common law marriage; the name, birth date, birth place and street address, of your children.

**ANSWER:**

| Full name | : | Sylvia Ann Garcia Vasquez | |
|---|---|---|---|
| Other nanes | : | Sylvia A. Marcos (Previus marriage) | |
| Date of Birth | : | 3-1-64 | |
| SS# | : | 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 | |
| DL# | : | 10286559 | |
| Address | : | 1550 Ventura, Brownsville, Tx. 78520 | |
| Spouse | : | George Vasquez | |
| Previous Spouse | : | Javier Marcos | |
| Children | : | Jacob | DOB: 12-2-88 |
| | | Geena | DOB: 8-23-93 |

**INTERROGATORY NO.2:**

Please identify, by giving their name, address and telephone number, each expert who may be called as an expert witness on your behalf in this case, including each expert used for consultation and not expected to be called as a witness at trial, if said consulting expert's opinions or impressions have been reviewed by a testifying expert and provide the following information for each expert identified in your answer:

(a)    the subject matter on which each expert witness is expected to testify;

(b)    the mental impressions and opinions held by each expert, including the mental impressions and opinions held by each consulting expert, if their opinions and impressions have been reviewed by a testifying expert and the facts known to each expert (regardless of when the factual information was acquired), which relate to or form the basis of the mental impressions and opinions held by the expert, including the facts knoxvn to each consulting expert, if their opinions or impressions have been reviewed by a testifying expert;

(c)    the credentials and background which you contend qualify each expert to express an opinion, including a list of cases in which each expert has previously testified, whether at trial, by deposition, or otherwise, by stating the cause number, the style of the case, the district, county and state or division.

**ANSWER:**   Objection.  Plaintiff objects to the discovery request as calling for the disclosure of the identity, mental impressions, and opinions of experts who have been informally consulted, or retained on a consulting basis, who are not expected to be called as witnesses at the trial of this cause, and whose work product is to expected to form  a basis either in whole or in part of the opinions of an expert who will be called as a  witness.

Plaintiff has not retained any testifying experts at this time.   Plaintiff's experts, when and if designated, will be available for deposition at a mutually agreeable time and place.  At that time, and upon request, Plaintiff will provide the Defendant with information regarding that testifying expert's mental impressions or opinions and the facts known by him.

## INTERROGATORY NO.3:

Please identify by name, address and phone number, all persons known to you, your attorney, or other agents who have or are believed to have knowledge of relevant facts, and state the knowledge possessed by each.

**ANSWER:**

Sylvia Vasquez
George Vasquez
1550 Ventura
Brownsville, Tx. 78520

Mr. Glover
Ransom Olds
Dolly Barrera
Janie Garza
Vctor Cornejo
Ana Medina
Fernando Chila
Esperanza Gonzalez
Diana De La  Rosa
Mary J. Padilla
c/o K-Mart
Brownsville, Tx. 78520

## INTERROGATORY NO.4:

Please describe the nature of your claimed disability and list the daily activities you are unable to perform because of the alleged disability.

**ANSWER:  I have a hearing disability, but it does not prevent me from performing any of my daily activities.**

**INTERROGATORY NO. 5:**

Please describe when you were first diagnosed with your disability, by whom, and the health care professionals who have been treating you since.

**ANSWER:** I was diagnosed when I was a small child in Chicago. I do not know who the doctor was. In 1989, I saw Dr. Rafael Arredondo, 1084 Los Ebanos, Brownsville, Tx., 956/544-2703 In 1995, I went to Valley Hearing Associates, 864 W. Price Road, Brownsville, Tx. 78520, 956/544-2783.

**INTERROGATORY NO. 6:**

Please identify every type of device which you use to treat or compensate for your alleged disability. (Identify includes type, make, model, and name and address of prescribing doctor.)

**ANSWER:** I use hearing aids. I do not know the type, make or model. Valley Hearing Associartes has this information.

**INTERROGATORY NO. 7**

Please identify the name, address, and telephone number of every medical providers which you have seen over the past ten (10) years for the treatment of any kind of physical or psychological ailment you have had.

**ANSWER:** Objection. Plaintiff objects to this interrogatory in that it is unduly burdensome and oppressive in that it requests information for a period of ten years.

Without waiving the foregoing objection, Plaintiff states:

In 1993, I saw Dr. Guajardo for Post Partum syndrome after the birth of my daughter. I also went to Charter Palms.

In 1994, I saw Joan Brotman in Harlingen, Tx.

In January, 2000, I went to see a counselor in Harlingen due to this incident.

**INTERROGATORY NO.8:**

Please identify every K-Mart Corporation employee who you told on an official or unofficial basis about your disability prior to the incident made basis of this lawsuit.

**ANSWER:** No one.

**INTERROGATORY NO.9:**

Please identify every request you made for any type of accommodation for your alleged disability from any K-Mart personnel, include to whom the request was made, what accommodation was requested, whether the request was in writing, and the response to each request.

**ANSWER:** None.

**INTERROGATORY NO. 10:**

Please identify all employment actions taken by K-Mart Corporation which you consider adverse employment action take against you because of your alleged disability.

**ANSWER:   None.**

**INTERROGATORY NO. 11:**

Please describe in detail every complaint you ever made of discrimination or harassment in connection with your employment with K-Mart Corporation, include to whom the complaint was made, the date and time of the complaint, the exact substance of the complaint, whether the complaint was in writing, and the response to each complaint.

**ANSWER:   O bjection.   Plaintiff objects to the term "in detail" on the grounds that it is vague, general, overly broad and open ended.  Moreover, this Plaintiff should she err in recalling each and every detail would be subject to vexatious and undue attempts at impeachment.**

**Without waiving the foegoing objection, Plaintiff states:  I made verbal/oral complaints to Mr. Olds.  He told Mr. Glover by telephone.  He told me Mr. Glover would take care of it when he was down here.  I then called District Regional Human Resources direct since Mr. Glover had done nothing.  I left  a  message for Rachel, but she never called back.**

**INTERROGATORY NO. 12:**

Regarding your complaints of harassment/discrimination as set forth in your pleadings, please provide the following:

(a)     The date of each alleged act of harassment or discrimination;

(b)     The names of all persons who allegedly harassed or discrimination against you;

(c)     A detailed description of each and every alleged act of harassment or discrimination for which you seek recovery in this lawsuit;

(d)     The names of all persons to whom you reported these alleged acts of harassment or discrimination and the dates of each report;

(e)     The names of all persons with whom you talked regarding these alleged acts of harassment or discrimination; and

(f)     Any action that resulted from your complaints of harassment andlor discrimination.

**ANSWER:**   Objection.  Plaintiff objects to this interrogatory as it is burdensome and is asked only for the purposes of  harassment and annoyance.

Without waiving the foregoing objection, Plaintiff states:

Comments made by Mr. Olds regarding my hearing aids:

The comments started in 1998.  He would say funny comments like  "Can you hear me?", and "Turn up that volume, girl".  The comments were usually made in the general office.  Witnesses were Esperanza Gonzalez, Office Lead, 63 Calle Reyna, Brownsville, Tx. 546-3034.

One day between November 1 and November 5, 199, Mr. Olds approached me in the back stockroom where I was setting up a hidden camera and he told me that I had a phone call on the line.  He specified that it was my District Manager (T.J. Foye) on the phone, he then said, "He has been on hold for a long time and I told him you were here but that you probably had your hearing aid turned all the way down."  He than saw that I had an angry look on my face and he said, "I'm just kidding, Sylvia."

I walked out of the stockroom and out of the general office to take my call in my office.  Victor Cornejo was with me, helping me set up the camera.  He is the Electronic Department Manager and resides at 4846 La Entrada Dr., Brownsville, Tx.

On November 8, 199, Mr. Olds came into my office for something and that is when I broke down crying telling him that I was very upset at the way Dolly Barrera was treating me.  I told himthat she was hostile towards me regarding my hearing aids.  Mr. Olds then said, "It's all my fault.  I should have never started saying anything about your hearing aids."  There were no witnesses present.

Comments made by Dolly Barrera regarding my hearing aids:

One day between October 17 and October 24, 1999, Dolly Barrera was very upset at me becaszue I had insited on a complete audit to be made of some trailers holding merchandise in the back of receiving.  Such audits would take a lot of effort and manpower but were important and the policy of K-Mart.

Dolly Barrera was in the Human Resource Manger's Office sitting down very angrily with the door wide open.  My office is next door to the Human Resource Manager's Office and as I walked out of my office and passed the Human Resource Office Dolly yelled out something.  I did not hear her so I walked back toward the Human Resource Office and said "What did you say?"  Dolly Barrera said angrily, "you hear only what you want to hear, don't you Sylvia?"  I was extremely embarassed but said nothing.  Human Resource Manager Diana De La Rosa was present, she resides somewhere in San Benito, phone number is unknown to me.  Also present in the Human Resource Office was Mary Jean Padilla, she resides in Harlingen, phone number is unknown.

On November 7, 1999, I was paged over the PA System by Mary Anne, a Service Desk Associate to go to the Service Desk.  Before I left to go I called her on the phone to

find out what she needed.  She said she had an unruly customer there.  I hung up and proceeded to go.  As I got to the service desk Dolly Barrera was already there and the unruly customer was telling her off.  When the customer left Dolly turned to me angrily and asked me "Why hadn't I responded to the page.  Dolly told me that "Mary Anne was paging you over and over and over again and you can't hear?"  I then turned to Mary Anne and asked her, "How many times did you page me?"  Mary Anne held up one (1) finger.  Dolly than said I better come running next time.

Later on that same day Janie Garza, Up-Front Manager came in to my office to visit with me.  I told Janie that Dolly was acting like a B- - - -.  Janie said, "You know what Dolly just told me in the (General) office?  I had asked Dolly if she knew Where yu were because I was looking for you and Dolly said "I don't know, but if you knock on her office door she won't hear you because she has her hearing aid turned all the way down".  Janie resides on Iowa St., Brownsville, Tx.   Her phone number is 831-2655.

In addition, please see Plaintiff's live pleadings.

INTERROGATORY NO. 13:
        Please identify the precise date, place, and persons who were present, if any, when the alleged incident(s) occurred with Dolly Barrera that form the basis of this lawsuit.

ANSWER:   I do not remember precise dates, but witnesses present were:  Mary Padilla, Diana De La Rosa, Janie Garza and Mary Ann ( I do not remember her last name.  She's a coach at Burns Elementary who worked part-time at K-Mart.)

INTERROGATORY NO. 14:
        Please identify the precise date, place, and persons who were present, if any, when the alleged incident(s) occurred with Ransom Olds that form the basis of this lawsuit.

ANSWER:   I do not remember precise dates, but witnesses present were: Victor Cornejo and Esperanza Gonzalez.

INTERROGATORY NO. 15:
        Please identify the date and place any K-Mart associate, include the name of the associate, told you "harassing" or negative comments were being made regarding your alleged disability.

ANSWER:    I do not remember precise dates.  Janie Garza told me.

INTERROGATORY NO. 16:
        Please list by name, telephone number, address, and title each physician, psychiatrist, psychologist, counselor, nurse, chiropractor, or any other person practicing in the healing arts that you consulted for diagnosis or treatment for any injury you allege was caused as a result of the incident made the basis of this lawsuit.

**ANSWER:    The counselor in Harlingen, but I do not recall his name.  Plaintiff will supplement.**

INTERROGATORY NO.17
        Please explain the significance you give the fact that you were taking the drug Zoloft to the facts alleged in your lawsuit. Include in your response the condition for which you are under the medication, who prescribed it to you and why you believe the person of whom you complain in your complaint would have any reason to know that this medication was of any importance to any comment they may have made to you, assuming that they did.

**ANSWER:    Objection. Plaintiff objects to this interrogatory is over broad and further that it seeks matters which are not relevant to the subject matter in the pending action, and the matters sought are not calculated to lead to the discovery of relevant or admissible evidence.**

**Without waiving the foregoing objection, Plaintiff states:  Dr. Matthews prescribed this medication for depression.**

INTERROGATORY NO. 18:
        If you or your attorney or agent have taken any written, oral or recorded statements, photographs or videotapes concerning or pertaining to the subject matter of this lawsuit or are aware of any such statements, recordings, videotapes regardless of whether they were taken by you, please identify by name, address and telephone number the persons making this statement (whether written, oral or recorded, taking the statement, photograph, videotape or recording), identify every person in possession of the statement, recording, photograph or videotape or transcription thereof and identify all persons who have seen or heard the statement recordings or photographs.

**ANSWER:    None at this time.  Depositions will be taken in the future, but Defendant will have equal access.**

INTERROGATORY NO. 19:
        Please state the nature and extent of any injury "whether physical, psychological, or economic" which you allege you sustained as a result of the incident in question.

**ANSWER:    Objection. Plaintiff is not a medical doctor and cannot be held to that standard.  This inquiry is best addressed to each doctor, healer, health care provider or clinic since Plaintiff is not medically trained.  Further, Plaintiff's medical records contain this information.**

**Without waiving the foregoing objection, Plaintiff states:  I suffered more depression.**

INTERROGATORY NO. 20:
        Please state the full detail of any accident, injury, hospitalization and/or illness for any physical, psychological, emotional, or any other condition, that you have suffered which has occurred within the five (5) year period previous to or subsequent to

the time preceding to the incident made the basis of this lawsuit.

**ANSWER:** Objection. O bjection. Plaintiff objects to the term "in detail" on the grounds that it is vague, general, overly broad and open ended. Moreover, this Plaintiff should she err in recalling each and every detail would be subject to vexatious and undue attempts at impeachment.

Without waiving the foregoing objection, Plaintiff states:

In 1993 or 1994, I went to the emergency room at Valley Regional Medical Center due to cutting my finger while doing dishes.

1993 – I saw a counselor at Charter Palms for post-partum syndrome.

1994 – I saw counselor Joan Brotman in Harlingen.

In 1995, I went to the emergency room at Brownsville Medical Center due to a severe toothache after having dental work on my teeth.

Also, see answer to Interrogatory No. 7 above.

**INTERROGATORY NO. 21:**
Please provide your weekly work schedule, by days and hours, for the preceding six (6) month up to the time of your resignation.

**ANSWER:** Objection. Plaintiff objects to this interrogatory as it is impermissibly cumbersome and harassing. This request is for material for which Defendant has possession, custody and control and to which the Defendant has equal access and is asked only for the purposes of harassment and annoyance.

Without waiving the foregoing objection, Plaintiff states: I would work 40 hours per week. This included two evenings. 12:00 p.m. to 9:00 p.m. or 1:00 p.m. to 10:00 p. m.

Every 2 months, I had to work over night. 10:00 p. m. to 6:00 a.m.

**INTERROGATORY NO. 22:**
Are you employed now, and if so please provide the name, address, and telephone number of your supervisor, and every company, business, or person with whom you have applied for work with since the time of your resignation from K-Mart Corporation.

**ANSWER:**

1.      **Texas Department of Human Resources**
        **155 E. Hwy 77**
        **San Benito, Texas 78586**

        **Supervisor: Richard Aguirre**

2.      **March 2000 – Census Bureau**

3.      **April, 2000 – Brownsville Independent School District**

**INTERROGATORY NO. 23:**
        Please list in chronological order every check returned for non-sufficient funds you wrote to K-Mart for which you were not suspended or terminated..

**ANSWER:    None.**

**REQUEST FOR PRODUCTION NO. 1:**
        Please produce all copies of any and all written documentation you intend to introduce into evidence at the time of trial for the propose of proving up your alleged claim and/or damages.

**RESPONSE: Objection. Plaintiff objects to request as it is over broad and vague and is calling for trial strategy and attorney work product which are privileged from discovery.**

**REQUEST FOR PRODUCTION NO. 2:**
        Please produce all copies of statements of any agents or employees of this Defendant taken in connection with the facts of this case. In the event statements taken were tape recorded and the transcriptions have not been reduced to writing, duplicate copies of any tape recording are hereby requested.

**RESPONSE: None at this time.   Depositions will be taken in the future, but Defendant will have equal access to the same.**

**REQUEST FOR PRODUCTION NO. 3:**
        Please produce copies of statements of all parties and/or witnesses taken in connection with the facts of this case. In the event statements taken were tape recorded and the transcriptions have not been reduced to writing, duplicate copies of any tape recording are hereby requested.

**RESPONSE: None at this time.   Depositions will be taken in the future, but Defendant will have equal access to the same.**

**REQUEST FOR PRODUCTION NO.4:**
        Any and all photographs, motion pictures, video television recordings, maps, drawings, charts, diagrams, measurements, surveys or other documents concerning the events and happenings made the basis of this lawsuit, the scene of the alleged incident, persons or objects involved, either made before, at the time of or after the time of the events in question, including any photographs made of you at any time since the incident made the basis of this lawsuit, that you, your attorney or anyone acting on your or their behalf, have or know of, and which are not privileged.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO.5:**
Any and all correspondence, notes and memoranda between you and Defendant prior to the filing of this lawsuit.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO.6:**
All diaries, journals, notes or memoranda kept by you as a result of this injury, which delineate, describe or mention your injury, pain, discomfort or ailment for which you seek recovery in this lawsuit.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO.7:**
All diaries, journals, notes and memoranda kept by you as a result of the alleged occurrence, which delineate or refer to any expenses or damages incurred by you as a result of the occurrence made the basis of this lawsuit.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO.8:**
Your entire file with respect to any investigation of the occurrence or the circumstances leading up to the occurrence performed by you or anyone acting on your behalf, which took place previous to anticipation of litigation.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO.9:**
Copies of your Federal and State income tax returns and W-2 forms for each of the five (5) years preceding the alleged occurrence. In this connection, also execute the attached authorization to obtain income tax records.

**RESPONSE: Executed Form 4506 – Request for Copy or Transcript of Tax Form is attached.**

**REQUEST FOR PRODUCTION NO. 10:**
Copies of any and all documents, including, but not limited to applications, payment receipts, application rejection notices, etc., from any State, Federal, Private and/or any other program related to any illness, medical condition and/or injury, including, but not limited to life insurance benefits, Social Security benefits, maritime benefits or disability benefits from the Veterans Administration or any other governmental agency or any private insurer of disability and/or medical benefits, from who you applied for financial assistance. In this connection, also execute the attached authorization for Social Security records, authorization to obtain records from the Texas Department of Human Resources, and the authorization to obtain Health Insurance

records.

**RESPONSE: Executed authorization for social security records is attached.**

## REQUEST FOR PRODUCTION NO. 11:

Copies of any and all documents of any type whatsoever reflecting job placement applications and/or unemployment insurance benefit payments made through the Texas Employment Commission since November 1999. In connection with this also execute the attached authorization.

**RESPONSE: Executed employment authorization is attached.**

## REQUEST FOR PRODUCTION NO. 12:

Copies of any and all work records pertaining to the Plaintiffs employment at each of her jobs for the last five (5) years. In this connection, also execute the attached authorization.

**RESPONSE: Executed employment authorization is attached.**

## REQUEST FOR PRODUCTION NO. 13:

Please produce all letters and correspondence between this Defendant and you or any one on your behalf relating to matters alleged in Plaintiffs lawsuit or the matters alleged in Defendant's pleadings, other than correspondence between counsel and pleadings.

**RESPONSE: Objection. Plaintiff objects to this request as it is overbroad and vague and does not adequately describe with particularity the specific information to which the Defendant would be entitled.**

**Without waiving the foregoing objection, copies of correspondence with EEOC is attached.**

## REQUEST FOR PRODUCTION NO. 14:

Please produce all copies of all agreements with any individual, entity, party or arising out of or pertaining to the subject matter of this lawsuit.

**RESPONSE: None exist at this time.**

## REQUEST FOR PRODUCTION NO. 15:

Please produce any and all copies of all correspondence, records, or other documents between you and any other person or entity pertaining to the incident made the basis of this lawsuit, if such person may offer expert testimony at any time of trial, or if such person's opinion or impressions were to any person who may offer expert testimony at the time of trial.

**RESPONSE: Objection. Plaintiff objects to request on the basis that the discovery request asks for information not yet availabile because it is premature.**

**Subject to the foregoing objections and without waiving same:**

**Plaintiff has not retained any testifying experts at this time. Plaintiff's experts, when and if designated, will be available for deposition at a mutually agreeable time and place. At that time, and upon request, Plaintiff will provide the Defendant with information regarding that testifying expert's mental impressions or opinions and the facts known by him.**

**Plaintiff also reserve the right to call any and all of the health care providers, including their doctors, nurses, agents, servants, and/or employees and their respective Custodian of Medical and/or Billing Records, including but not limited to those listed above. They may be called upon as potential expert witnesses to testify about diagnosis, treatment and prognosis of the Plaintiffs including causation, and damages past and future.**

**REQUEST FOR PRODUCTION NO. 16:**
　　　Please produce any and all copies of all written records which reflect or evidence the existence of any practices or polices of K-Mart which you or any persons offering expert testimony or opinion at the time of trial contend were violated in such a manner as to cause you harm in any way.

**RESPONSE: Plaintiff does not have any documents responsive to this request.**

**REQUEST FOR PRODUCTION NO. 17:**
　　　Please produce any and all expert reports that were or will be reviewed and/or relied upon in whole or in part by any testifying expert or witness in this case.

**RESPONSE  Objection. Plaintiff objects to this request on the basis that the discovery request asks for information not yet availabile because it is premature.**

**Subject to the foregoing objections and without waiving same:**

**Plaintiff has not retained any testifying experts at this time. Plaintiff's experts, when and if designated, will be available for deposition at a mutually agreeable time and place. At that time, and upon request, Plaintiff will provide the Defendant with information regarding that testifying expert's mental impressions or opinions and the facts known by him.**

**REQUEST FOR PRODUCTION NO. 18:**
　　　Please produce any and all copies of documents received from K-Mart regarding your resignation.

**RESPONSE: None.**

**REQUEST FOR PRODUCTION NO. 19:**

Please produce any and all diaries, journals, notes or memoranda kept by you as a result of your resignation, which delineate, describe or mention your alleged damages.

**RESPONSE: None.**

**PLAINTIFF RESERVES THE RIGHT TO SUPPLEMENT HER ANSWERS AND RESPONSES AS DISCOVERY PROGRESSES.**

**STATE OF TEXAS** §

**COUNTY OF CAMERON** §

    **BEFORE ME**, the undersigned authority personally appeared **Sylvia Vasquez** whose name is suscribed to the foregoing answers to Interrogatories and upon his oath, acknowledged to me that the answers are true and correct.

_____
Sylvia Vasquez

    **SUBSCRIBED AND SWORN TO BEFORE ME** on this the _12th_ day of _December_, 2000, to certify which witness my hand and official seal.

JOSIE O. LUCIO
Notary Public,
State of Texas
My Comm. Exp. 08-22-2004

_____
Notary Public, State of Texas

CERTIFIED 1
COPY

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN OF TEXAS
2         BROWNSVILLE DIVISION

3    SYLVIA VASQUEZ            )
                              )
4    VS.                       )   NO. B-00-108
                              )
5    K-MART CORPORATION,       )
     RANSOM OLDS, and          )
6    DOLLY BARRERA             )

7

8    _____

9

10              ORAL DEPOSITION OF

11                SYLVIA VASQUEZ

12              FEBRUARY 6, 2001

13   _____

14

15        ORAL DEPOSITION of SYLVIA VASQUEZ, produced as

16   a witness at the instance of the Defendants, and

17   duly sworn, was taken in the above-styled and

18   numbered cause on the 6th day of February, 2001,

19   from 2:00 p.m. to 3:43 p.m., before Eric Schwab,

20   Certified Shorthand Reporter in and for the State of

21   Texas, reported by computerized shorthand machine,

22   at the offices of Michael R. Cowen, 765 East 7th

23   Street, Suite A, Brownsville, Texas, 78520, pursuant

24   to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.



1       A P P E A R A N C E S

2  FOR THE PLAINTIFF:

3
            Michael R. Cowen
4           MICHAEL R. COWEN, P.C.
            765 East 7th Street, Suite A
5           Brownsville, Texas   78520

6
   FOR THE DEFENDANTS:
7
            Eileen M. Leeds
8           WILLETTE & GUERRA, L.L.P.
            International Plaza, Suite 460
9           3505 Boca Chica Boulevard
            Brownsville, Texas   78521
10

11                      **INDEX**

12

13  *WITNESs:  SYLVIA VASQUEZ*                    *PAGE*

14  Examination by Ms. Leeds...........................3

15  Witness' Signature Page/Corrections..............75

16  Reporter's Certificate...........................78

17

18                      **EXHIBITS**

19

20 *EXHIBIT*              *DESCRIPTION*              *PAGE*
            No. 1    11/10/94 Separation Report...............9
21          No. 2    04/19/95 Separation Report...............9
            No. 3    03/18/98 Separation Report...............9
22          No. 4    12/16/99 Separation Report..............18
            No. 5    San Juanita Garza Statement.............39
23          No. 6    11/12/99 Vasquez Letter to Olds.........62
            No. 7    Dismissal and Notice of Rights..........67
24          No. 8    Undated Vasques Written Allegations.....66

25

1    A    That there's a problem, that there's a

2   situation with me and Dolly and that I had a

3   complaint that Dolly was saying things about me,

4   personally, about my hearing.

5    Q    Did he mention what the problem was?

6    A    Yes, he did.  And Mr. Glover said that he

7   was going to come into town the following day and

8   that he would resolve the matter and he was going to

9   talk to everybody.

10    Q    That's what Mr. Olds told you Mr. Glover

11   said?

12    A    Right.

13    Q    You now know that Mr. Glover was there?

14    A    Yes.

15    Q    You saw him?

16    A    I saw him.  He gave me instructions on a

17   particular project he wanted me to do.

18    Q    Did you approach him at all with this

19   complaint?

20    A    No.

21    Q    You waited for him to approach you?

22   · A    Yes.

23    Q    You didn't go to him and say, "Mr. Glover,

24   I have a complaint, we have to talk"?

25    A    No.

Case 1:00-cv-00108   Document 15   Filed in TXSD on 02/23/2001   Page 33 of 58

1   Q   Why were you waiting for him to come to
2   you?
3   A   Because I trusted -- I thought he was
4   going to resolve things.  He was always surrounded
5   by people.  I had no chance to talk to him.
6   Q   Did you ever tell him you wanted to talk
7   to him in private?
8   A   No.  I talked to Mr. Glover once in
9   private and he happened to tell other people what I
10   talked to him about.  It was before this incident,
11   so I didn't trust Mr. Glover very much.
12   Q   How many people at that store knew you
13   wore hearing aids?
14   A   I thought nobody knew except when Mr. Olds
15   started saying things to me out loud.
16   Q   We'll get to that.  Do you know if anybody
17   knew or you just think nobody knew?
18   A   I don't know if anybody knew.
19   Q   All right.  On Tuesday when Mr. Glover was
20   there, you never attempted to approach him, correct?
21   A   Correct.
22   Q   Your next step was to wait until Wednesday
23   and, when you saw that Mr. Glover had gone, then you
24   called -- which did you call first, headquarters or
25   human resources?

1      A      I don't know.

2      Q      Who did you call at headquarters?  You're

3 talking about Minneapolis?

4      A      Troy, Michigan.  There's like a complaint

5 hot line.

6      Q      Is that number posted in the employees --

7      A      Right.

8      Q      Do you remember who you talked to there?

9      A      No.

10     Q      Is it like a switchboard?  Have you ever

11 called there before?

12     A      No.

13     Q      And what did they tell you?

14     A      They looked up my particular store and

15 they said, "Well, that complaint should be handled

16 by Mr. Glover."

17     Q      Now, who is the human resource district

18 manager?

19     A      Her name was Rachel.

20     Q      Right.

21     A      I don't know her last name.

22     Q      Is that different from this hot line?

23     A      Yes.

24     Q      Okay.  So the people at Troy told you this

25 complaint should be handled by Mr. Glover?

1      A      Right.

2      Q      Is it then that you called the human

3   resource person --

4      A      Actually, I don't know which one I called

5   first.

6      Q      But both of them told you that this

7   complaint should be handled by Mr. Glover?

8      A      I never talked to the human district

9   manager.

10     Q      Either before or after you talked to the

11  human resource district manager, whose name is

12  Rachel, something like that, and did you leave a

13  message?

14     A      Yes.

15     Q      You spoke to somebody there?

16     A      Right.

17     Q      Tell me what they said.

18     A      They just said she would call me back.

19     Q      And she didn't call you back on Wednesday?

20     A      No.

21     Q      And that was the last day you worked

22  there?

23     A      Yes.

24     Q      Okay.  How would you describe your

25  relationship with Mr. Olds?  You worked with him for

1        A        No.

2        Q        What happens when an employee writes a bad

3    check?

4        A        When an employee writes a bad check,

5    they're just contacted like a regular customer

6    through our check recovery system, but I would get a

7    printout of any employees that had bad checks and I

8    would just, you know, look into that and file it.

9    It would just be information.

10       Q        That was part of your job, right?

11       A        Right.

12       Q        Would you ever say that your relationship

13    with Mr. Olds ever deteriorated?

14       A        No.

15       Q        So you two had a pretty good working

16    relationship right up to the end?

17       A        Yes.

18       Q        That didn't happen with Dolly, right?

19       A        No.

20       Q        Let's stick with Olds for just a minute.

21    You have said in your petition that late in 1998 he

22    started making funny comments.  He would say -- and

23    I'm reading from your answers to interrogatories.

24    "He would say funny comments like, 'Can you hear me?

25    Turn that volume up, Girl.'"  Are those the kinds of

1  things that he would say to you?

2       A    Yes.

3       Q    Was he saying them in a way to demean you

4  or was he joking around with you?

5       A    Joking.

6       Q    Did you feel that he was trying to hurt

7  you or just, you know, employee banter?

8       A    No.   That's just his character.   He likes

9  to poke fun at anything he sees.

10      Q    And he did that with you?

11      A    Yes.

12      Q    Did you say stuff back to him?   I know

13  people make fun of his last name because it's Olds,

14  but was that pretty much the kind of relationship

15  you had, you two got along well at the workplace?

16      A    We got along, yeah.

17      Q    Were you offended by the things that he

18  would say?

19      A    Yes.

20      Q    Did you ever tell him that they offended

21  you?

22      . A    No.

23      Q    Did he know from any of your gestures or

24  your looks or -- you know how a look can be worth a

25  thousand words.   If he says, "Hey, turn that thing

1    up, Girl," and you were to look at him really bad

2    like, "Don't you say that to me."  Did you ever look

3    at him like that?

4         A    Yes, I did.

5         Q    When did you do that?

6         A    I don't know.

7         Q    Did you do that often?

8         A    Yes.

9         Q    These comments that you say started in

10   1998, did you ever report any of those to anyone?

11        A    No.

12        Q    Did you even talk to anyone about them,

13   that these things that Mr. Olds was saying bothered

14   you?

15        A    No, I was embarrassed.

16        Q    You didn't even tell it to Mr. Olds,

17   right?

18        A    No.

19        Q    That's kind of his nature, that he just

20   says stuff like that?

21        A    Mm hm.

22        Q    And it wasn't just with you that he would

23   do that, right?

24        A    Right.

25        Q    Do you know how often he would do this?

1     A    Maybe once a week.

2     Q    Now, the next thing you say about what

3 persons said, you mentioned that Mr. Olds told you

4 in a back stock room that you had a phone call and

5 mentioned that, you know, that Mr. Foy had been on

6 hold a long time.  Do you recall that?

7     A    Yes.

8     Q    Tell me about that incident.

9     A    I was in a back stock room where you

10 cannot hear the intercom and I was setting up a

11 camera because somebody was stealing in that back

12 stock room and I was setting up a camera and the

13 electronics manager was helping me and that's when

14 he approached me and said, "Where have you been.

15 Mr. Foy" -- which that was my district manager --

16 "he's been on hold for a long time," and I told

17 him -- and that's when he said that he had told him

18 that, "She probably has her hearing aid all the way

19 down," or something like that.

20     Q    You mention in here that you gave him a

21 look that showed him that you were angry about that.

22 Do you recall if you had given him that look before?

23     A    Not that bad of a look.  I had -- that

24 look was really bad.

25     Q    In fact, he understood that look?

1    A     Yeah.   There was no question about that

2    look.

3    Q     It was at that point that he knew that his

4    comments had bothered you, right?

5    A     Mm hm.

6    Q     Would you say that prior to that time he

7    never even thought that his comments were bothering

8    you?

9                MR. COWEN:  Objection.  Calls for

10   speculation.  You can answer.

11   Q     (BY MS. LEEDS)  If you know.

12   A     No, I don't know.

13   Q     Is Mr. Olds the kind of person that, if

14   you tell him, "Hey, don't say that to me, it hurts

15   me," would he keep doing it?

16   A     I don't know.

17   Q     Did you and he have the kind of

18   relationship that, if he knew he were hurting you by

19   a comment, would he continue to have done it?

20   A     I don't know.

21   Q     Now, you mentioned that that was November

22   1st and 5th -- or it was the day between November

23   1st and 5th, which is the week before that Sunday,

24   correct?

25   A     Yes.

1    Q    And you mentioned that on that Monday,

2  November 8th, you told him about what had happened

3  the day before with Dolly?

4    A    I'm sorry --

5    Q    On November 8th, which was that Monday you

6  walked out, you told Mr. Olds what had happened

7  between you and Dolly the day before, which was the

8  Sunday?

9    A    Right.

10    Q    What happened that Sunday between you and

11  Dolly?

12    A    Well, that Sunday -- she had been treating

13  me badly and making comments about my hearing, and

14  that particular Sunday I was in my office and I

15  received a page to go to the service desk, so I

16  called the service desk instead of going there

17  because previously if I would go over there it would

18  just be something simple, so I called to see what

19  was it that they needed and they told me that there

20  was an unruly customer there that they wanted me to

21  control.

22              So that's when I went over there real

23  quickly and the customer was telling off Dolly and,

24  as soon as the customer finished telling off Dolly,

25  Dolly was really, really mad at me and she asked

Case 1:00-cv-00108   Document 15   Filed in TXSD on 02/23/2001   Page 42 of 58

1    me -- she was screaming where was I and she said, "I

2    was paging you and paging you and paging you and you

3    can't hear anything."

4              I know that wasn't true, so I asked

5    the service desk girl, "How many times did you page

6    me," and she just held up one finger and Dolly, she

7    didn't have anything to say about that, but she said

8    "Next time you better come running when they page

9    you."

10        Q    Okay, is that when you walked out?

11        A    No.

12        Q    Okay.

13        A    And then I was really upset at this point,

14   so I went back to my office and that's when I saw my

15   friend Janie Garza and I told her about Dolly.

16        Q    Let me just interrupt.  Is that San

17   Juanita?

18        A    Right.

19        Q    Go ahead.

20        A    And Janie said -- she told me what Dolly

21   had told her -- had just told her in the general

22   office.

23        Q    Which was what?

24        A    Which was Janie asked Dolly, "Have you

25   seen Sylvia," and Dolly said, "No, but you co -- if

1    you knock on her door, it wouldn't be any use

2    because she has her hearing aid all the way down."

3        Q    And Janie told you that Dolly had just

4    told her that that day?

5        A    She had just told her that before coming

6    into my office.

7        Q    And that was on Sunday, the 7th?

8        A    Right.

9        Q    Is that when you walked out?

10       A    Yes.

11       Q    Did you call anybody that day?

12       A    No, I was too upset.

13       Q    How about Monday, is Mr. Olds the only

14   person you talked to?

15       A    Yes.

16       Q    So you came back to work on Monday and you

17   talked to Mr. Olds, Mr. Olds called Mr. Glover and

18   Mr. Glover was going to be in town the next day?

19       A    Right.

20       Q    All right.  Had Dolly ever said anything

21   to you before that Sunday?

22       A    About my hearing?

23       Q    Yes.

24       A    Yes.

25       Q    What had she said?

1      A      Like one time when I told her about some
2    work that needed to be done and I knew there was no
3    manpower to do the work, but this work was a
4    requirement and it was my job to see that it was
5    done, she was very, very upset with me.
6                So she was in the personnel office,
7    the human resource office, talking to the human
8    resource manager and the soft lines manager and I
9    happened -- the human resource manager is right next
10   door to the loss control manager's office, so I
11   walked by the human resource manager's office and
12   she said something out loud to me and I didn't hear
13   what she said, and I knew she was very upset with me
14   so I wanted to know what she had said so that's why
15   I came back, I asked her -- I told her, "What did
16   you say?"
17                She said, "You can't hear -- you hear
18   only what you want to hear."
19      Q      Do you know when this was?
20      A      No.  It's written down somewhere.
21      Q      You mention here that it was between
22   October 17th and the 24th.
23      A      Okay.
24      Q      How is it that you recall that day?
25      A      How did I recall that?

1       Q    Okay.  Any other comments?

2       A    About hearing?

3       Q    Mm hm.

4       A    No, not that I -- I can't recall right

5 now.

6       Q    Now, you have produced a statement from

7 Janie, correct?

8       A    Mm hm.

9       (Brief Discussion Off The Record)

10      Q    (BY MS. LEEDS)  Ms. Vasquez, you have

11 produced a statement -- she says San Juanita, but

12 you know her as Janie -- Ms. Garza has given to you,

13 correct?

14      A    Yes.

15      Q    I'm going to hand that to you, Exhibit

16 Number 5 to your deposition, and ask you if you

17 recognize that as the statement that Janie wrote for

18 you?

19      A    Yes, she signed it.

20      Q    Do you know when she wrote that?  Do you

21 find a date on there anywhere?

22      A    No.

23      Q    Was this after you left?

24      A    Yes.

25      Q    Did you ask her to do this?

1    working at K-Mart and Mr. Olds was making these

2    comments, did he ever demote you or do anything to

3    affect your job at all?

4         A    No.

5         Q    What about Dolly?

6         A    No.

7         Q    Was your employment affected in any way

8    other than the way you felt about these people?  Was

9    your employment, the conditions, the money you made,

10   the things you did, was it affected in any way?

11        A    No.

12        Q    Do you think that you were being -- I know

13   your lawsuit is a discrimination lawsuit because of

14   the way you were treated.  Were you discriminated

15   against in terms of your employment by reason of

16   your -- what they would say about your hearing?

17             MR. COWEN:  Objection to form.  You

18   can answer.

19             THE WITNESS:  I don't understand.

20        Q    (BY MS. LEEDS)  Okay.  You are suing for a

21   hostile environment claim.

22        A    Yes.

23        Q    You're claiming that they mistreated you

24   by saying things about your hearing.

25        A    Yes.

1    Q    My question is, do you feel your

2    employment, the job you did, the money you made, the

3    things you were in charge of, were you discriminated

4    against in that sense while you were at K-Mart?

5             Basically, your job, not what you

6    felt but what you did, what they paid you, what you

7    did.  Could you continue doing the same things you

8    did?

9             You had the same work schedule you

10   did, the kinds of things that have to do with your

11   employment, do you feel that they discriminated

12   against you in that sense?

13   A    No.

14   Q    Did they affect your employment is,

15   basically, the question?

16            MR. COWEN:  Object to the form of

17   that question, but you can answer the question.

18            THE WITNESS:  Did it affect my

19   employment?  It affected my job performance.

20   Q    (BY MS. LEEDS)  Right, because of the way

21   you felt?

22   A    Because of the way I felt, yes.

23   Q    No, my question goes to just the

24   intangible things.  You had a certain job to do.

25   A    Right.

1     Q    They paid you a certain amount of money --
2  what was your schedule?
3     A    I made my own schedule provided that I
4  worked two nights a week.
5     Q    Did that ever change?
6     A    Periodically, yes.
7     Q    Was that a corporate decision or was that
8  something that --
9     A    Corporal.
10     Q    So Troy, Michigan, told you you had to do
11  certain things and one of those things was you had
12  to work two nights a week?
13     A    Right.  And other things.  Every 60 days I
14  had to work overnight.
15     Q    Is that big K-Mart a 24-hour store?
16     A    No.  The overnight was because of the
17  maintenance crew that worked overnight.  They needed
18  to be watched.
19     Q    Your pay was never affected, right?
20     A    No.
21     Q    Would you say any of the terms of your
22  employment, were they affected by this?
23     A    No.
24     Q    Basically, we're talking about the things
25  that they said made it uncomfortable for you to work

1   there?

2       A    Right.

3       Q    And you were hurt by that?

4       A    Yes.

5       Q    And as a result of that, you walked off

6   the job?

7       A    Yes.

8       Q    And you are also saying that Ana Medina

9   never told you that this human resources person

10  called you back?

11      A    Right.  I'm sure she would have told me.

12      Q    What if Ana didn't get the message?  Do

13  you even know if anybody from K-mart ever called you

14  back and tried to fix the problem?

15      A    I don't know.

16      Q    Have you ever worked with anybody in the

17  store or ever heard of anybody in the store that had

18  made a complaint to headquarters and how long it

19  takes for them to get going on something like this?

20      A    Yes, lots of people have made complaints

21  to headquarters.

22      Q    Do you know if they've ever dealt with a

23  complaint about a disability?

24      A    I don't know.

25      Q    Do you know if they've dealt with anything

1    like, you know, somebody claiming sexual harassment

2    or anything like that?  Do you know what it is they

3    do at headquarters to try to figure out what's going

4    on?

5         A    I don't know.

6         Q    Do you know what Mr. Glover is supposed to

7    do in terms of trying to fix things?

8         A    I don't know.

9         Q    Do you know if Mr. Glover ever talked to

10   Dolly?

11        A    I don't know.

12        Q    Other than Janie's statement, have you

13   asked anybody to give you any kind of statement or

14   testify on your behalf?

15        A    No.

16        Q    Have you talked to any of the employees at

17   K-Mart about, you know, "Will you come and testify

18   against Dolly?"

19        A    I'm sorry?

20        Q    "Will you come and testify against Dolly?"

21        A    I never talked to anybody about that.

22        Q    Have you talked to Ana Medina?

23        A    I talked to Ana.

24        Q    What have you talked to her about?

25        A    I've never asked her to come and testify.

1       A     Right.

2       Q     And you say Fernando, is he still in the

3   Harlingen office?

4       A     Yes.

5       Q     Is there anything other than hearing

6   without your aids that you cannot do because of your

7   hearing impediment?

8       A     Anything other than my hearing?

9       Q     Right.  Well, we asked you the question

10  what kind of daily activities can you not do?

11  Obviously, you are impaired in your hearing.

12      A     Right.

13      Q     But do you have any dizziness, do you have

14  anything associated with your hearing loss that does

15  not allow you to do something?

16      A     Anything associated with my hearing

17  loss --

18      Q     That prevents you from doing something.

19      A     Well, I'll tell you, it has happened when

20  my battery goes off or I've been having problems

21  with one of them and, when that happens, I cannot

22  hear.

23      Q     Right.  My question --

24      A     Other than that, no.

25      Q     My question goes to sometimes with people

1   with hearing loss have inner ear problems, so

2   they're not supposed to drive or get on a roller

3   coaster.  Is there anything like that that's

4   associated with your hearing loss that you cannot

5   do, other than if you don't have your hearing aid

6   you can't hear?

7        A    No.

8        Q    You can do most anything that most people

9   can do with your hearing aids in?

10       A    Right.

11       Q    Now, you say that you were diagnosed in

12   Chicago.  When did you move to the Valley?

13       A    To the Valley, I was about nine years old.

14       Q    Been here since?

15       A    Right.

16       Q    Is your family down here?

17       A    No, they moved back.  Still the only one

18   here.  I also lived in Houston a couple of years.

19       Q    You never had to ask for any kind of

20   special treatment at K-Mart, did you?

21       A    No.

22     . Q    Did you think you needed it?

23       A    No.

24       Q    Did you tell Mr. Olds that you were on

25   Zoloft?

1    A    Yes.

2    Q    When did you tell him?

3    A    I think it was the summer of 1999, I

4  think.

5    Q    Why did you tell him?

6    A    He told me his daughter was having a lot

7  of problems and they didn't know what was wrong with

8  her and I suggested the medication that I was

9  having.  I gave him a copy of -- you know, the back

10  that they give you after you get your medicines?

11    Q    Right.

12    A    I gave him that because it seemed like she

13  had the symptoms of depression.

14    Q    Do you know if he followed up on your

15  advice?

16    A    Yes, he did.

17    Q    In terms of the word "hostile," you

18  know -- you have an idea -- I'm not talking about

19  what hostile environment means from a legal sense,

20  but when somebody is hostile.  Would you say that

21  Dolly's comments were hostile towards you?

22    A    Dolly is hostile.

23    Q    Would you say that Olds' comments were

24  hostile towards you?

25    A    I think Olds' comments were made to be a

CUtePDF - www.cutepdf.com

1  joke.

2       Q    But insensitive.

3       A    Right.

4       Q    I want you to know that that is different

5  than the legal phrase "hostile environment."

6       A    Yes.

7            MR. COWEN:  Which is why I didn't

8  jump up and scream.

9            THE WITNESS:  Mr. Olds did have some

10 hostile tendencies, but not regarding hearing aids.

11 He made me cry many times.

12      Q    (BY MS. LEEDS)  He can get mad.

13      A    Yes.

14      Q    I know Mr. Olds.  When he gets mad, he

15 gets very mad.

16      A    He gets hostile.

17      Q    What does George do at Sears?

18      A    He's in sales.

19      Q    What department?

20      A    Washers and dryers.

21      Q    Do you participate or attend in any

22 community programs for the hearing impaired?

23      A    No.

24      Q    Have you joined any associations or are

25 you an activist in support for hearing impaired

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN OF TEXAS
 2                      BROWNSVILLE DIVISION

 3     SYLVIA VASQUEZ              )
                                   )
 4     VS.                         )    NO. B-00-108
                                   )
 5     K-MART CORPORATION,         )
       RANSOM OLDS, and            )
 6     DOLLY BARRERA               )

 7
                       REPORTER'S CERTIFICATION
 8               ORAL DEPOSITION OF SYLVIA VASQUEZ
                        FEBRUARY 6, 2001
 9

10          I, Eric Schwab, Certified Shorthand Reporter in

11     and for the State of Texas, hereby certify to the

12     following:

13          That the witness, SYLVIA VASQUEZ, was duly

14     sworn by the officer and that the transcript of the

15     deposition is a true record of the testimony given

16     by the witness;

17          That the deposition transcript was submitted on

18     ___2-14-01_____ to the witness or to the attorney

19     for the witness for examination, signature, and

20     return to Schwab Court Reporting Service by

21     ___3-19-01_____;

22          I further certify that I am neither counsel

23     for, related to, nor employed by any of the parties

24     in the action in which this proceeding was taken,

25     and further that I am not financially or otherwise
```

1   interested in the outcome of this action.

2       Further certification requirements pursuant to

3   the Federal Rules of Civil Procedure will be

4   complied with after they have occurred.

5       CERTIFIED to by me this __14th_____ day of

6   February, 2001.

7

- 8

9                    _____

10                   Eric Schwab
                     Texas CSR 401
11                   Expiration Date:  12/31/02
                     SCHWAB COURT REPORTING SERVICE
12                   2900 Central Boulevard, Suite C
                     P.O. Box 3665
13                   Brownsville, Texas  78520
                     (956) 544-5126

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SYLVIA VASQUEZ | § | |
| PLAINTIFF | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-108 |
| | § | (JURY REQUESTED) |
| K-MART CORPORATION, | § | |
| RANSOM OLDS, and DOLLY BARRERA | § | |
| DEFENDANTS | § | |

**ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On this day, came on to be heard, Defendants **K-MART CORPORATION, RANSOM OLDS and DOLLY BARRERA**'s Motion for Summary Judgment filed in this cause. All parties appeared by and through respective counsel. The Court, after examining the pleadings and summary judgment evidence, and hearing the arguments of counsel is of the opinion and finds that Defendants **K-MART CORPORATION, RANSOM OLDS and DOLLY BARRERA** are entitled to summary judgment.

IT IS THEREFORE, ORDERED ADJUDGED and DECREED that Defendants **K-MART CORPORATION, RANSOM OLDS and DOLLY BARRERA** are entitled to summary judgment, that Plaintiff SYLVIA VASQUEZ take nothing against Defendants, and all Plaintiff's claims against Defendants are dismissed with prejudice.

IT IS FURTHER ORDERED all taxable costs are to assessed against the Plaintiff. All relief requested and not expressly granted is hereby denied.

Signed this the ___ day of_____, 2001.

_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SYLVIA VASQUEZ | § | |
| PLAINTIFF | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-00-108 |
| | § | (JURY REQUESTED) |
| K-MART CORPORATION, | § | |
| RANSOM OLDS, and DOLLY BARRERA | § | |
| DEFENDANTS | § | |

**ORDER SETTING HEARING ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On this the _____ day of _____, 2001, came on for consideration

Defendants **K-MART CORPORATION, RANSOM OLDS and DOLLY BARRERA**'s

Motion for Summary Judgment.  The court having reviewed said motion together with the papers

on file is of the opinion that a hearing shall be held thereon.

IT IS THEREFORE, ORDERED, ADJUDGED and DECREED, that Defendants'

Motion for Summary Judgment is hereby set for hearing on the _____ **day of**

_____**, 2001 at** _____ **o'clock**.

Signed for entry on this _____ day of _____, 2001.

_____
UNITED STATES DISTRICT JUDGE